The next case is Elder v. McCarthy. Good morning, Your Honors, and may it please the Court, Fabian Thiambali of Shapiro-Arado for Appellant Jarvis Elder. While Mr. Elder was at Attica Correctional Facility, he was charged with forging disbursement forms in order to steal money from the account of another inmate. There are corrections officers whose job it is to prevent forgery by checking disbursement forms and checking the identification of the inmates who submit them to make sure it's the right inmate. As a result, the theory of guilt here was that on seven different days, a half-dozen correction officers either didn't do their jobs or were somehow fooled by Mr. Elder into believing that he was someone completely different. These were therefore critical witnesses, and that's why Mr. Elder requested that they be interviewed before the hearing and that they be present at the hearing as witnesses. However, the hearing officer did not call these witnesses, and according to Mr. Elder, the assistant who was assigned to help him prepare his defense refused to help and did not locate them. Let me know from, and it may not be clear in the record, but when these forms are submitted for signature, is it assigned and given back to the inmate, or is it taken by the person, the guard who's supposed to sign, and then sent on? Your Honor, it's not clear from the record, but the testimony at the disciplinary hearing and other evidence in the record suggests that the inmate submits the form, a hall captain checks it, stamps it, signs it, is then sent to a business unit for processing at some point. There's a separate signature from the business unit. We don't know how it gets to the business unit. That's correct, Your Honor. And is there anything in the record also to establish who was on duty at what time to review these forms that were submitted? Well, yes, Your Honor. The logbooks and the staffing grid that Mr. Elder submitted on summary judgment identify all of the officers in A Block who were assigned to the day shift or the evening shift, and specifically identify the hall captains, and the hall captains are the individuals who stamp and sign the disbursement forms. So in order to determine which individual signed a particular disbursement form, the hearing officer merely had to look at the logbook, determine which two hall captains potentially could have seen the form, and then ask each of them, is this your signature? That's all the hearing officer had to do. Those records were readily accessible, the record suggests? They were, Your Honor. I mean, they were produced in discovery. Mr. Elder submitted these records on summary judgment, and defendants said nothing about them. They didn't even mention them. They didn't present any evidence whatsoever in response. They didn't present an argument in response to the effect that it was justified that the hearing officer and the assistant failed to consult these records. It's important to remember that in Kingsley and this court's other denial of witness cases, this court has made very clear that it is not the inmate's burden to show that the hearing officer or the officer assistant was arbitrary and capricious. It's the defendant's obligation to prove the rationality of his or her position. And here, the defendants completely failed to discharge that burden of proof when presented with evidence that they should have consulted staffing records in order to identify witnesses They said nothing. So clearly they did not establish their entitlement to judgment as a matter of law and were not entitled to summary judgment, contrary to what the district court held. But in fact, Mr. Elder was entitled to summary judgment because the defendants didn't satisfy their burden of proof. Now on appeal, the defendants have argued that, oh, it's just too burdensome to consult these records.  More importantly and substantively, there was no evidence in the record to suggest that it would have been burdensome to consult the records. And also when you really think about it, that argument is quite remarkable because the whole purpose of having records that document who does what and who is responsible for what is to make it easy to answer questions like this. So your theory is in the seven days that we're looking at, you could look at these records and I've looked at them, identify who the hall captain is, and then bring that person to the hearing. And this is pretty, not very difficult thing to do. So it falls squarely within the holding of Kingsley. That's correct, Your Honor. And in fact, if you look at the records, there are only, in discovery, only records for a certain subset of days were produced. But the records clearly exist for the entire period. At most, the hearing officer would have had to consult 12 or 13 hall captains in order to determine which ones had signed the forms. And remember, the list in Kingsley that the hearing officer was supposed to consult in order to identify witnesses identified 36 potential inmates who might have had testimony that could have corroborated the inmate's account in Kingsley. How do we get to 12 or 13 hall captains to consult? Well, because we have records for the dates of four of the seven forms. And those records indicate that there are at most, I believe, there are five to seven, I believe, hall captains on those dates. Certain hall captains worked on multiple days. And so you'll see the same name on multiple days. The hearing officer, in order to get to the bottom of those four disbursement forms, would have had to consult six hall captains, I believe. We have the precise number in the reply brief, but I believe it's six. And then for the other dates, for the other three forms, at most, there were two hall captains per day that the hearing officer would have had to consult the day and the evening shift hall captain for those dates. So when you add six plus six, it's 12. There is potentially one more hall captain. So 13 at most. It's far fewer than the number of witnesses that the hall captain would have had to consult in Kingsley. Also, in Ayers versus Ryan, the hearing officer was liable for failing to identify a witness, locate a witness who was, in fact, at another facility and who was identified only by cell number. There was no argument that it was too burdensome. And the hearing officer was liable for failing to bring that witness. Let me ask you about one aspect of your due process claim, as I understand it. You point out that Elder was charged with and convicted of theft under a rule that prohibits theft of state property. That's correct. And that he was, in fact, convicted of, if you will, in terms of the evidence that was offered, theft of another inmate's property. But was there any real confusion in the proceedings here about what he was being charged with? It was theft of this other inmate's property. Is there really, what are the effects of that mismatch? It looks more like a typographical error than anything else. Well, Your Honor, he was charged with theft under a rule that says theft of state property. He was convicted of that. That's also in the record of the disposition and the sanction. It's true that at the hearing, it was clear that Mr. Elder was accused of stealing from another inmate. But the point is that the charge and the conviction were invalid because the rule simply doesn't cover the conduct that he was accused of. So they just, the miscitation is the basis for your claim. But there was, in fact, a rule that he could have correctly been charged with violating. There is indeed a rule that prohibits theft of other inmates' personal property. But I just want to be clear, that's not the only argument for why the evidence was insufficient. As your honors know, the fourth department found that the evidence was woefully insufficient and vacated the hearing disposition on that ground. I see my time is up, but I'll just briefly finish the thought. And the reason was that although perhaps there was some evidence that Elder filled out the forms, there was no evidence in the hearing whatsoever that Lawrence hadn't authorized the disbursements. There was no, there was evidence perhaps of a money transfer, but no evidence of actual theft, any lack of consent. And so because- It may not have been sufficient evidence, but I'm having difficulty concluding that there wasn't some evidence in this record. Your honor, respectfully, there was no evidence because all that we had was a misbehavior report that said, I received an investigation of possible forgeries against an inmate's account. Comparing some handwriting, I determined it was this culprit. That's all the officer testified to at the hearing. There was no evidence that Lawrence had not authorized the disbursements or that he had complained about unauthorized withdrawals from his account. There was the misspelling of Lawrence's name. And the fact of countersigning from the officers themselves, I realized they weren't called and that claim may have, seems to me to be potentially have some merit, but the business office processed these forms. So, I mean, I'm not, there may have, there may not have been substantial evidence, but, but why isn't that sufficient to meet the more deferential standard we're talking about here? Well, your honor, the fact that the name was misspelled and that according to the officers, the handwriting on the disbursement forms looked like Mr. Elder's, all that establishes is that perhaps there was some evidence that Mr. Elder filled out the forms, but that doesn't establish that he was not authorized to fill out the forms, that it was impermissible. People transfer money to each other all the time. Inmates can owe each other money. They may decide to send money to another inmate's family member. That's not a crime under the offenses charged here, unless it's without authorization. That's what theft is. That's what forgery is. And so if there is no evidence in the hearing record that the purported victim didn't authorize the disbursements or that even complained about the disbursements, there is no crime. And I'll note that even if the misbehavior report had said, Lawrence told me that these disbursements were unauthorized, which it did not, this court clearly held in Luna versus Pico that a victim's accusations have to be independently assessed for reliability. The implications of what you're saying is that someone signing someone else's name on a disbursement request is guilty of no, or is presumptively guilty of no offense because the prosecution hasn't shown that it was consented to that he signed someone else's name or forged someone else's name. I don't know if that's perhaps some other violation of the disciplinary rule, but in terms of theft, if it's authorized by another inmate, then it's not, it's not theft. I mean, an essential element of theft is a lack of consent or authorization. And so it's, it's the state's burden to affirmatively show a lack of consent. It's not a mere defense. Um, unless your honors have further questions, I'll leave it at that. Thank you. May it please the court, uh, Patrick Woods on behalf of defendants, uh, the court should affirm, uh, both on the basis of what Supreme court said on the, and on the uh, which is where I'd like to start because I think it's the clearest road through all of the, uh, various claims involved on appeal. Um, I first like to address waiver. Uh, we did slightly overstate the case in our brief and we said it could be raised at any time. Uh, what, what it is, is that waiver on qualified immunity under this court's jurisprudence is reachable and it's reachable wherever qualified, and this court regularly reaches it wherever qualified immunity can be determined as a facts that need to be gleaned from the record on remand. Uh, the court reaches it regularly under those circumstances and those circumstances apply here, um, to each and every one of the claims that are, that are raised on appeal. Uh, if I could, I'm going to, I'd like to tie that in a little bit to the, uh, question about what needed to be done by the hearing officer and relatedly what, uh, needed to be done by the inmate assistant with respect to identifying who the officers who countersigned these were. Um, I think it's pretty telling, uh, as to how apparent it was because the standard from Kingsley is that it must be who the people are has to be readily identifiable. Not that there are records that can lead you down a path that would make you make it possible to identify the person. It's important to note that in. I'm concerned that, I mean, it was possible to identify these witnesses, um, who were involved with and had knowledge of the forms that were allegedly forged and, um, there was little effort made to identify them. I think the assistant went and just asked five random people in the block, you know, do you know who this is? Uh, why wasn't there an obligation to do something more than that? Well, to be clear, it was, it was possible. Was it not to identify the people who would have in the, according to the schedule, have dealt with those forms? If the, if the hearing officer had gone and pulled those records, which no one suggested that he should, not the. That can't be the standard, right? The inmate doesn't know. I want you to go look at the staff planning grid or the log book. Um, he says, I want to, I want to be able to confront, I want to have these witnesses available at the hearing. Right. The standard is whether what the hearing officer did in order to figure out who those witnesses was, was reasonable. Um, and here he did take efforts. If you look at Kingsley and the other case that appellants rely on, uh, the hearing officer did nothing. The hearing officer said, you have to tell me who this witness is. Otherwise I cannot call them. The hearing officer here went, went through each and every one of these forms, was unable to determine who signed it. Why wasn't the assistant bound to take more action? I mean, it was kind of clear that if there's staffing reports or schedules that you could identify the people who would have been responsible for it. He did nothing of that sort. Well, I would say, why is that okay? I would say two things about that. One, there is a dispute about whether the assistant was in fact asked to do that. The record shows on page 43 of the record, which is the list that, uh, Mr. Elder signed on the inmate assistant form of what he asked for. He did not ask the, the inmate assistant to go and speak to any of those officers. He asked for them to be present. Uh, and the inmate assistant passed that information along to the hearing officer. Well, so there's a factual dispute at summary judgment. Maybe he, maybe he said, I'd like you to interview these people. Maybe he said, I'd like them present at the hearing. If you're the assistant, you could interpret I'd like them present at the hearing, an assistant could do that. So tell me why that wouldn't be reasonable and why given the circumstances, you're looking at illegible signatures. These, it's pretty important, uh, to figure out how this theft took place, to go back and see what you can find out. And if it's readily available from a staffing planning grid in this log book, that's reasonable assistance to help, help him identify those witnesses. Right. And I don't think it is readily available from the staffing planning in the log book. If you look at those, if you look at those, those, those records, um, and particularly with respect to the hall captains, um, it's not clear from those records or anything that follows from it, that the procedure actually is that a hall captain is the one who signs off on it. Not all of them even have a stamp from the hall captain. If you look at the stamps themselves, they also have a line for an additional signature that should be coming from a hall captain. Only one of them actually has that signature from a hall captain. And although all of them have a signature, a different signature on a different line that is sometimes stamped over, uh, for the office or the illegible signature of an officer who accepted the form. Uh, moreover, it's not clear looking at those. It's not clear from its face, how you would get to the first person. And even from there, it's not clear that a reasonable step is to require the inmate assistant who has a short period of time before the hearing commences, uh, to identify folks, to go from that, to pull up staff, uh, staff logs and planning grids, and then to go from there to, to presumably hall captains or someone who has identified to ask them, to maybe lead them to yet more people. There's really no analysis of this at all in the district court's opinion. It's hard to, um, to infer all of that, uh, that you're now arguing as being the, it's analysis, because we have a single, uh, sentence. He wasn't required to do it, uh, due process wasn't violated. Well, and I think that that's right, judge, but, uh, that's also because the question under Kingsley and whether due process is whether reasonable steps were taken, not whether the best available steps were taken, not whether they succeeded with the steps that they took and the hearing officer here did take reasonable steps. He went and tried to get more legible copies of the forms, um, which was in by comments from, uh, Mr. Elder during his hearing, and he went to the block and consulted with officers. Uh, the record would be better if it provided us with more detail as to which officers he consulted with. We don't know if he talked to hall captains. We don't know if he talked to others, but those are reasonable steps. And more importantly, and this is why I said that I think qualified immunity is actually the clearest road through this case is that it's not clear under Kingsley that the steps that the hearing officer took here were not reasonable or appropriate. Um, he did make an effort and, you know, to borrow the phrase from white versus Polly, you know, qualified immunity protects all those, but the plainly incompetent and those who knowingly violate the law, it was not plainly incumbent for the hearing officer here to take the steps that he took particularly where, um, no one at any point suggests that he should have consulted these other logs, not other officers, not himself. And by the end of the hearing, uh, Mr. Elder indicates that he's, you know, happy with the amount of work that went into it. And he says, you know, you can only do so much, uh, unqualified immunity. I'd like to just go back for a minute. Um, what is the reason this wasn't raised until, um, uh, you didn't raise it at summary judgment, except as to the superintendent. Is that right? When was it first raised as to the other defendants? And what was the reason for, uh, not? I don't know what the, uh, trial attorney's reasoning was there. I think that there was just a, I think it may just have been an oversight and, and they rely on Nortel for that point. And I don't think Nortel is a, one, Nortel is not a qualified immunity case, but second, and I think that's an important distinction. Um, qualified immunity is a doctrine made by the courts in order to recognize the public officials need wiggle room in order to do their jobs. And that, that policy consideration does not change whether it's first raised on appeal or whether it's first raised below. Um, so I think that... It does change the course of the litigation, right? To raise that, uh, at an early stage, it allows the argument and the, uh, uh, earlier adjudicators to, um, assess, uh, whether right was clearly established and whether the, uh, with the boundaries of the officer's actions were right. It certainly would be best for the issue to be raised earlier, but that doesn't mean that an officer who would otherwise should be entitled to qualified immunity should be held personally liable later, just because it's not. And I don't think that there's law to support the contrary proposition. Uh, there's a question of fact here with regard to the inmates access to the disbursement forms himself, right? Uh, there's a question in fact, as to whether he asked for them from his inmate assistant. Um, he was allowed access to them at the hearing. The hearing was then adjourned for a week. He was not provided copies that he could keep, uh... You say he was allowed access for them at the hearing. I understood they were kind of shown to him, but he didn't have copies. He could keep and study and, um, uh, examine, um, looking for, for example, some way to identify who had signed the, uh, the forms, right? Uh, he was not given copies that he could keep and take with him partially because as I understand the regulations, that might have actually been putting contraband in his hands. But, uh, but aside from that point, um, he was, he was not given a copy he could keep, but he was clearly very familiar with what was in them. And the record shows clearly that he was shown them. Didn't he want to see exactly what the dates were as well? Right off the, at the beginning, when he's, uh, before he's given access to them, um, he says that he doesn't know the dates, he doesn't raise that at any later point in the hearing. And later in the hearing, he makes other arguments about the forms themselves. You know, he says that, why do we only have the top copy of the form that has the stamp on it when it might be easier to read the triplicate copy that the stamp wouldn't have followed through on? I mean, that you, that you could see that the other way, going back to the, uh, assistance claim that if he's shown the, uh, the disbursements forms very briefly at this hearing, and he himself is coming up with some arguments as to this might help identify these, um, the hall captains, that if the assistant had taken more steps, um, we wouldn't be in this posture. I mean, he says he's shown the, the forms, he's just essentially put, they're put in front of him and then they're taken away. Well, I mean, again, there's a, he says that. But I don't think any reasonable jury could conclude that looking at the hearing transcript itself. Um, and I see I'm out of time. Could I just make one very brief observation? Um, in the event that the court does send some of the claims back and I noticed this is not an issue that comes up in the briefing either way, but the state law claim, uh, unlawful confinement claim that was dismissed was dismissed under New York correction law 24. It was not released, uh, as a, uh, pendant state law claim under supplemental jurisdiction. That claim should not be reinstated. Even if some part of this case goes back because the basis was not a release of jurisdiction. Thank you, Your Honors. Just a few points in rebuttal. Um, counsel for defendants says that it's not clear that the hall captains sign off on these disbursement forms. If you look at the disbursement forms, uh, for example, at a 307, there is a inmate identification verified a designating a block presumably, and then hall captain with a line. So the stamp indicates that the hall captain is the one who is verifying the inmates identification. Those are the people that we need to consult in order to determine whether they know if Mr. Elder or Mr. Lawrence submitted the form. Uh, and it's clear from the staffing grid and the log books who those hall captains are, if defendants wanted to provide an alternative explanation for what the stamp means or who processes the forms, uh, the time to do that was before the district court, these records have been at issue since Mr. Elder's complaint. He said in his complaint that these, um, defendants should have consulted the records. He presented them on summary judgment. They said nothing on qualified immunity. Um, oh, also I would note that in the fourth department's opinion, um, overturning the convictions, they said that, um, it's the hall captains who stamp the disbursement forms on qualified immunity. Um, they say that this court often overlooks waiver, especially in qualified immunity cases. However, in this case, it's not a mere inadvertent, uh, failure to argue qualified immunity. The defendants made the conscious choice to assert qualified immunity only as to one of the defendants. And they made an argument that was entirely different from the argument that they are now making on appeal. So if it's a tactical decision, there's really no basis to reach qualified immunity, um, for the first time on appeal. Moreover, uh, in terms of the merits of qualified immunity, I think Kingsley clearly establishes the right that's at issue here and makes it objectively unreasonable for an officer to fail to consult readily available records, which is the term used in Kingsley. Um, the, the list in Kingsley was not a simple list of witnesses who could all certainly be called. It was a list of 36 potential inmates who might have had relevant testimony. It was a step to finding actual witnesses. And so it was analogous to this case. Thank you, Your Honors. Thank you both. And thank you for your pro bono representation. That is the last argued case on the calendar this morning. So I'll ask the clerk to adjourn court.